CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
7/29/2019
JULIA C. DUDLEY, CLERK
BY: s/ C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

IN THE MATTER OF THE SEARCH OF:

INFORMATION ASSOCIATED WITH
TWITTER PROFILE WITH USERNAME:

"JESUS THUMPER" @SHARONB88896771
AT HTTPS://TWITTER.COM THAT IS
STORED AT PREMISES CONTROLLED BY
TWITTER

Case No. 7:19MJ76

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, BRYAN A. EMMERSON, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Twitter account that is stored at premises owned, maintained, controlled, or operated by Twitter, a social-networking company headquartered in San Francisco, CA. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Twitter to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the Twitter account.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since February 2002. I am currently assigned to the Richmond Division, Roanoke Resident Agency (RRA) located in Roanoke, Virginia. Prior to working the RRA, I was assigned to the Honolulu Division of the FBI. I have received training at the FBI's Quantico training facility. Further, I have experience and training in a variety of investigative and legal matters, including

the topics of lawful arrests, the drafting of affidavits, and probable cause. Having worked multiple cases involving the use of the Internet, I am familiar with how the Internet can be used to transmit messages in several formats, to include but not limited to, emails, blogs, and Twitter postings. I have participated in numerous federal, criminal investigations, and am currently investigating various federal violations, including those outlined in this affidavit.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. §115(a)(1)(B) and Title 18 U.S.C. §875(c) have been committed by SHARON JOHNSON BURTON (hereinafter "BURTON"). There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## BACKGROUND REGARDING TWITTER

5. Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users to create and read 140-character messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve. These features are described in more detail below.

6. Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20

2

characters or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

7. Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

8. A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

9. Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

10. As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted"

3

the user's own Tweets, as well as a list of all Tweets that include the user's username (*i.e.*, a list of all "mentions" and "replies" for that username).

11. Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

12. Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

13. When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

14. A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are following that user (*i.e.*, the user's "followers" list) and a list of people whom that user follows (*i.e.*, the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

15. In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

16. Twitter users can configure the settings for their Twitter accounts in numerous ways. For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

17. Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

18. Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

19. If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

20. In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user

for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

21. As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element. In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation. For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal

6

plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

22. Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

## **PROBABLE CAUSE**

23. On June 18, 2019, my office received a referral from the United States Attorney's Office for the Western District of Virginia and the United States Secret Service (USSS) regarding potential threats made by SHARON JOHNSON BURTON against the Honorable United States District Judge James Jones, of the Western District of Virginia, who had previously sentenced BURTON to a term of imprisonment, on drug related charges, in February 2008. Specifically, the USSS advised that two June 14, 2019, "Tweets" from the Twitter account "Jesus Thumper @ Sharon B88896771," an account maintained and operated by BURTON, appeared to threaten Judge James Jones. In one, BURTON stated "I want judge [sic.] jones [sic.] dead," and in the other BURTON stated "I'll stab jones [sic.] federal judge [sic.] up his asshole a [sic.] rip the [sic.] guts to flor [sic.] whores."

24. On June 18, 2019, the USSS visited BURTON at her residence, located at 272 Earles Road, Rural Retreat, Virginia. This location is also within the Western District of Virginia. The USSS confronted her regarding these, and other, threatening statements. With respect to the Tweets regarding Judge Jones she did not deny or affirm the posting of the Tweets, but rather advised that she did "not like" Judge James Jones.

7

25. On June 19, 2019, your affiant made a Preservation Request, pursuant to 18 USC 2703(f), to Twitter, Inc., for all accounts associated with "Jesus Thumper @ Sharon B88896771." Twitter, Inc. affirmed receipt of this request and agreed to preserve the accounts.

26. On June 20, 2019, your affiant interviewed BURTON, who acknowledged that she had written the Tweet regarding wanting to stab Judge James Jones, the same federal judge that had previously sentenced her. She expressed regret, noting that she did not intend to hurt the Judge, rather she wanted to get things off of her chest, because she felt like she was going to die. She claimed the charges against her had been false and that she had sold drugs in the past but that the drugs she got convicted with were not hers, and so she felt like it was a set-up. When asked why she was posting this about the Judge, she mentioned the set-up and also mentioned that her son was killed while she was incarcerated (a fact that has not been confirmed) and that she blamed that on Judge Jones

27. After the meeting, my agency continued to monitor her Twitter activity. BURTON did not make any more specific threatening statements particularly related to Judge Jones, but she has continued to voice a displeasure with the federal government and judges in general.

28. During the investigation of this matter I also learned that, in December 2016, BURTON had left at least one inappropriate voicemail message with Judge Jones' office alleging that he was her father. Although the content of that message was non-threatening, a review of her Twitter history with respect to Judge Jones since that time may be relevant to the offense conduct described above.

8

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

29. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Twitter to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

30. Based on the forgoing, I request that the Court issue the proposed search warrant.

31. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

32. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Bryan A. Emmerson
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on July, 26, 2019 pursuant to Rule 4.1 of the Rules of Federal Procedure.

UNITED STATES MAGISTRATE JUDGE

9